Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for Appellant, Motorola. The District Court for the Western District of Washington issued an extraordinary and unprecedented anti-suit injunction in this case purporting to bar enforcement of a German injunction against Microsoft's ongoing infringement of Motorola's patents in Germany under German law. There is no basis for this anti-suit injunction in this Court's precedence, and I'd like to start going through the factors that this Court has asked us to look at with the factor of comity. The effect on comity here is intolerable. Before you tell us that, could you tell us how we get jurisdiction to hear this appeal? Under your argument, it appears that this is just a patent case, and if we look at it as a patent case, it would be fine. I'm referring to page 1 of your brief. But if it is a patent case and we're not doing our job, it should go back to Washington to the Federal Circuit. Your Honor, the issue of whether a preliminary injunction can issue in a Washington state law contract case is an issue of regional circuit law, not an issue in which patent interpretation under our patent laws is required. So this is governed by Ninth Circuit law, not Federal Circuit law. And it's governed by your decisions in GALA, which was a very well-written decision. It was. I agree with that. And in applied medical. But I'd like to start with comity, because you didn't find comity dispositive in those cases. And yet comity is dispositive here, because patent law, like copyright and trademark law, is territorial. We've collected the cases in this in our reply brief, the Motorola Gray reply brief at page 401. It's been reiterated as recently as the Microsoft versus AT&T case in the United States Supreme Court that our patent laws, which come from our Constitution's grant of power to Congress, apply to the relationship between monopoly and innovation in our boundaries, in our territory. We do not, the United States does not set patent law for the world. And the interference with comity here comes from the fact that an American district court has purported to interfere with enforcement of German patent law in Germany in a fully adjudicated case. So you feel we do have jurisdiction to hear the appeal. Unquestionably, Your Honor, because this is an issue of regional circuit law to decide the legitimacy of a preliminary injunction in a diversity jurisdiction-based, state law-based action. Remember, what Microsoft has purported to do here, we don't think there's any merit to the claim, it's purported to sue in Washington for a declaration that Motorola must give us a license to enjoy use of Motorola's standard essential patents for video decoding standard essential patents on RAND terms, reasonable and non-discriminatory terms. And they brought a contract action. They didn't bring a patent action. If it were a patent case, we might have to have taken this to the federal circuit. They brought a diversity jurisdiction-based state law claim. So we think that you properly have appellate jurisdiction here to decide whether the preliminary injunction issued by the court under its purported contract-based authority was valid. So we think it's governed by Ninth Circuit law. But if I could just continue, territorial... All that you say is true on this, but Judge Robart was very careful not to enjoin the German courts. Correct, Your Honor. No question, Your Honor. We concede that. There's no question that it's in persona.  It's an injunction against Motorola from enforcing that. And also he was very careful not to enjoin the German courts, as I understood it, from going ahead with a damages action. Yes, Your Honor. But that's where the offense to comity becomes clear. German patent law is different from American patent law. In American patent law, we have, thanks to my friend Mr. Phillips' advocacy in eBay, we have a presumption more or less against injunctions where damages are compensable. But more than that... But Germany is different. More than that, the contention, and I think Judge Robart agreed with this, is that he did explicitly agree with it, and Judge Posner agreed with it in his recent opinion, that inherent in the RAND commitment is not having an injunction. So, Your Honor, this is exactly where the offense to comity occurs. Germany does not agree with eBay. Germany does not agree with Judge Posner. And Judge Posner in Motorola against Apple in the Northern District of Illinois was not addressing foreign patents. The only patent at issue in Judge Posner's decision, sitting by designation in the Northern District of Illinois, was a U.S. patent. And he wasn't speaking to whether German law is different. German law is quite different. Damages are rare in German patent law. Injunctions are typical. But insofar as you're trying to find some special comity, I always say comity, comity rule here, because of the territoriality of patents, it seems to me that it kind of starts evaporating when the contract-based nature of the case that we're dealing with here is taken into account and the very limited nature of the injunction. The fact that the laws are different is a, here it's not, the reason for not having the injunction isn't the eBay reason, as I understand it. It isn't American patent law. It has to do with the nature of the contract. So, if you regard the current case as an essentially contract case in which there's been a commitment made not to ask for an injunction and not to get one on a worldwide basis, that's at least the premise. It may not turn out to be, but that's the premise. And I'm not seeing why that is a special problem with regard to comity, even though the patent law itself is different. Your Honor, first, we vigorously dispute that there is a contract here. Remember, the contract, the supposed contract is not between Motorola and Microsoft. It's supposedly between Motorola and the ITU, the international standard-setting organization that sets some kinds of standards, including these. Well, what do you say supposedly? I mean, that was a point that seems that your client conceded below. Your Honor, we don't concede that there's a contract enforceable through what the district court purports to have authority to do, which is he purports to have authority to, A, impose a global RAND license on the parties here, covering patents in 100 countries, sorry, 40 countries, 100 patents. And he said that we vigorously dispute and have always disputed that he has the authority to set a global RAND rate. If you look at the contract, your Honor, the contract that was served here is... Right, but before we go on, I thought it was conceded that Microsoft is a legitimate third-party beneficiary of the contract. The district court has found on motions for partial summary judgment that Microsoft is a third-party beneficiary of an enforceable contract. Where we dispute, your Honor, which has never been conceded, is what follows. Yeah, I get that. There's not been a determination of breach. In fact, the district court rejected summary judgment for Microsoft on breach. So to me, really, the kind of pivotal question here really is, do we get into any of this at this point? There obviously, eventually, there's going to be a judgment in this case, and there are going to be appeals. And there are going to be appeals on all of these questions, i.e., is this an enforceable contract? Can Judge Robart determine the RAND rate? And so on. So how does that feed in at the current point? Yes, your Honor, because step one of the Gallo applied medical analysis is, are the issues the same in the two cases? And we would argue the issues are not the same in the two cases. The issue in the Washington contract action is, may the district court impose, as a remedy for breach of contract under Washington law, a global RAND license with terms that he sets? We don't think he has authority to do that. I would refer you to the most important two pages in the record from Motorola's perspective, the ITU's principles themselves, ER-351 and ER-353. Well, if the parties don't agree on a RAND rate, who has the authority to set it for them? We think that the proper course here is for the parties to negotiate, and that's why we're referring to 351 and 353. I understand that position, but I didn't get to the what ifs. If the parties, if there's a recalcitrant patent holder. Right? The concern on the patent holder's side is holdout. But the patent holder of a standard essential patent will use its monopoly power to hold out an exact unreasonable terms. That's the concern that leads European law to impose the Orange Book procedure, which has been disregarded by the district court here. That's how Germany chooses to deal with all that problem. The problem on the other side is, what if you have an unwilling licensee who simply says, well, never mind, I don't have to enter into negotiations because I'm not subject to injunctions. He has a get-out-of-jail-free pass. The unwilling licensee here, Microsoft, can infringe, infringe, infringe. And owe a lot of money. But that money may never be recoverable. This $100 million escrow in Judge Robart's court is not going to be enforceable in Germany. In Germany, we would have to bring a separate damages action. Damages are not the usual course in Germany. Injunctions are. But if I could just go back to why there is an offense to comity here. Microsoft never sought to stay the German action. The German courts exercised jurisdiction. They entered final judgment. Microsoft to this day has never sought to stay the German action, didn't in the Mannheim court, has filed a notice of appeal, and hasn't moved to stay in the appellate court either. So the offense to comity is there. And last, Judge Robart simply disregarded the German procedure. Germany has a way of balancing holdouts against free riders. It's the Orange Book procedure. Microsoft could have escrowed into a German court an amount sufficient to cover Motorola's view of a RAND rate, and it could have had a court determine that that was too high and take out of that. But it's always or often true where these anti-suit injunctions are at stake, that the law in the two different places is different with regard to whatever it is that's being litigated. And certainly by emphasizing the Orange Book procedure, you're demonstrating that there is a substantial, that the question of how one enforces the RAND rate is a key issue and a determinative issue in both instances. It's simply that in Germany, because of the way they do this, they ended up getting to the merits of the patent case because the procedure didn't play out. It might have been... That didn't. Correct, Your Honor. But the point we would make is you have said that anti-suit injunctions are to be sparingly issued. There is a presumption against them. I am suggesting here that presumption has not been overcome. Let me focus on a second key difference between this case and Gallo and applied medical, the most important difference. Those cases involved forum selection clauses. The policy that was being foiled in the California forum was a policy agreed to bilaterally by the parties in those cases. Gallo and Andina had a forum selection clause saying California law governs all disputes between the parties that shall be litigated in the California forum. Similarly, the American and Belgian companies in applied medical had a forum selection clause that said California law governs and California forum is the exclusive venue and jurisdictional. What was protected by the anti-suit injunction in Gallo and applied medical was the power of the forum for which the parties had contracted to adjudicate a suit not to be displaced by a foreign action. Here, there is no foreign selection clause. There is no... I am not sure that you can carry it that far. It seems to me under Gallo and applied medical, we were looking whether or not the district court ought to be in the ball game at all. And we didn't know, but we said if it was capable of disposing of the issues. It wasn't based so much upon the nature of it. It's what the power, what the district court could actually dispose of the issues with its anti-suit injunction. Fair enough, Your Honor. You put three issues on the table in those cases. First, was there an offense to comity? There, there wasn't. Here, there is, because patent law is territorial. The contract issues in those cases were not. You asked second, was there a policy of the forum that the anti-suit injunction protected? What I am arguing to you here is that that is absent where there is no forum selection clause. It would be present if there was an arbitration clause you were protecting. It would be present if there is a forum selection clause you are protecting. But if the district court is simply usurping its own jurisdiction to decide whether a German court is allowed to enforce German patent law without a forum selection clause that says let's go to Microsoft's home venue. This is the point, I think, and I'm glad you're getting to it. The question is whether or not the district court can end up with a license, because they're going to argue if we have a license, then there's nothing they can do in Germany. So it's whether or not this process the district court is sending us on is capable of ending up with a license. Well, Your Honor, and that's the third of the factors. It's the one that's enumerated first in Gallo. Can the district court's decision dispose of the foreign action? And the answer to that question here is no, it may not. Because, and let me give you two answers. First, the district court does not have authority. If you look at the ITU's policies, there is no contract that creates a license. On page 353, you will see the disclaimer in the ITU principles that says a declaration of essentiality to the standards set forth by this body is not a grant of a license. Judge Robarts is operating from a fundamentally flawed and erroneous perception that there is a license that is simply, there's a license by virtue of the declaration of essentiality, by virtue of the October 29th letter. But that's why, I mean, to me, I come back to where I was before, and I guess I would like a comment on this. Ordinarily, one does not get into likelihood of success at this prong of the NIE. That's right, Your Honor. But I'm wondering whether we don't have to do it here. Because essentially, the contention in the case is that you're wrong about this. And Judge Robart has not purported to decide at this point. Doesn't it matter if this is a, at least possibly a way to look at things, or is not? I mean, don't we need in some sense to get into some likelihood of success question? Suppose you're totally wrong, or maybe you're possibly right, but it's possible that you're not. Doesn't that matter to answer this particular question? Well, Your Honor, in Gallo, you suggested that likelihood of success is not the inquiry here. It's displaced by the three factors. I do think, however, you have a pellet jurisdiction to decide the merits. You do have a pendant appellate jurisdiction in this case to decide that the asserted authority of the district court to set a global license, impose, create from scratch a global license, to replace the court's judgment with the complicated process of parties negotiating Rand's terms. Rand's terms are not just a rate. We would have to find it's capable of doing it, or we couldn't follow Gallo and allow the anti-suit injunction. That's right, Your Honor, but there is no incompatibility between the district court finishing out its contract case and us enforcing the injunction in Germany. And let me explain why. We can go enforce the injunction in Germany, and the two German patents that are being enforced do nothing to strip Judge Robarts of jurisdiction to set his Rand rate for the rest of the world in Washington. And get a license. And if you want, we think he has no authority to give a license. We might be wrong on the merits. We think we're right on the merits. Let me answer first your question, then go back to Judge Broussant. We think that he has no authority to grant a Rand license. The ITU contract doesn't provide for that. It's a usurpation of authority that would be unprecedented. The parties should decide. Getting back to my question. If the parties can't decide, who has the authority to set the Rand rate, in your view? Only the parties do. Here's what we think might be possible. If we find a breach. Now, remember that Judge Robarts is purporting to have a trial on a Rand rate before he's found a breach, which reminds one of the queen of hearts. Go ahead. Sentence first, verdict later. It's backwards. But even if he had authority to decide a Rand rate, Your Honor, nothing about the enforcement of the German injunction will prevent him from setting that rate. Suppose he goes forward. He says, I'm going to create a global license. I'm going to impose a Rand rate. All that happens then is Microsoft goes over to Germany. It says, hello, please vacate the injunction, because it's moot. We now have a license, and it's on Rand terms. So nothing about enforcing Germany prevents it. And what happens to all the sales that weren't made in the meanwhile? I'm sorry, Your Honor? What happens to all the sales that weren't made in the meanwhile? If there were lost sales in the meantime, then it could be worked out as a matter of retroactive compensation. We're owed retroactive compensation for infringement. There could be an offset. Microsoft has a duty. Microsoft could also avoid the whole problem by entering into Orange Book procedures, which it could even now. I see my time for rebuttal is rapidly disappearing, but I don't want to fail to answer questions. Keep going. Okay. Judge Berzon, I want to address your question about the standard. Do you get to likelihood of success? Gallo suggested that the Gallo applied medical three-part test displaces likelihood of success. And so we didn't argue likelihood of success. We think, however, it would be very odd for you to put a greater burden on us in this context. We think in this context, because there's a presumption against Nancy Sue's injunctions, actually, you should be more skeptical. You should be more skeptical, not less. But here's how likelihood of success. All we would have to show to defeat the preliminary injunction, a normal preliminary injunction standard, is likelihood of success. We think that the fact that these are to be sparingly ______ ______ lack of likelihood of success. Right. Exactly. Right. We think Microsoft needs to show far more. But here's how likelihood of success feeds into the Gallo test. It fits in in the first factor. Judge Wallace asks, is the district court's decision capable of disposing of the German action? We say no. It's not capable of disposing it. It's capable of mooting our enforcement of the injunction should Microsoft actually enter a license and begin paying for all the infringing use that's made of our patents. It's capable of mooting it. My understanding is that Judge Robart's premise, or at least possible premise, is that the agreement precludes asking for an injunction. Now, you vigorously dispute that. And that's why I come back to the question of don't we at least have to decide. You want us to decide that question on the merits, as I understand it. We ______ saying that he can't grant some license, and therefore doesn't ______ that the agreement does not either say that there is a license or that you can't get an injunction and simply provide some sort of retrospective mechanism. So, Your Honor, two steps. First, we think you should dissolve the anti-suit injunction against enforcement of Germany. It's an abuse of discretion. It's an offense to come ______. What if Judge Robart was right? Sorry? What if Judge Robart was right that, as I understand the steps, that by becoming party to this standard-setting organization and agreeing to license for a grand rate, they are inherently agreeing that they are going to allow people to use this at the grand rate and that they're not going to try to enjoin the patents. Instead, they're going to seek royalties at the grand rate. That's the premise, as I understand it. That is Judge Robart. It's either right or wrong. It's clearly wrong. All right. But even if it were right, you should still dissolve the anti-suit injunction because Judge Robart's setting a global grand rate is not capable of disposing of the ongoing and current infringement in Germany. All that it's capable of doing, if ultimately there are a lot of steps to whether a license is ever going to issue. He hasn't found breach. He hasn't shown that it's administrable to replicate what is very complex for the parties to negotiate. It's not just about grand rates. It's about grand terms. It's about grant backs of Microsoft, use of Microsoft's essential patents. It's about cross licenses of some non-essential patents. It's about terms and conditions about operations that aren't just about the patents. Even assuming he could replicate the parties' process, issue a grand rate, he cannot set a grand rate for German patents when the German court has said that under German substantive law, and if you look at the German opinion, if you look at ER 220 and ER 222, you'll see references to the fact that the German court is construing German patent law. And the German court is saying a RAND commitment does not displace the possibility of injunctive relief. And the German court gives you the policy reason why. It says if injunctions disappeared for the recalcitrant licensee of an essential patent, it just won't enter into negotiations. And remember, Microsoft has never tendered a dime for our essential patents and has never entered into negotiations. It countered our initial offer with a lawsuit almost immediately, less than two weeks later. So if there were to finally be a RAND license issued by the court, it still would not be within Judge Robart's authority in our view to set a RAND rate for two German patents. No, but it would moot the German action. He could moot the German action, but then we would have an injunction in Germany that we're enforcing. If there's ultimately a RAND license that's issued in the United States, Microsoft can take that to Germany and do what we would do in this country, say please recognize this foreign judgment and please vacate your injunctive order because we now have a license so we're not infringing anymore and that would be fine. I don't understand. Mootness is not the same thing as disposition. There's two different actions. But if he can't send a RAND rate for Germany, none of that is ever going to eventually. You would say, well, they can negotiate a RAND rate. Yes, they do. And we're back to Judge Thomas's question. And let me come back to Judge Thomas's question. Who sets it if the negotiations break down? We are – we concede that if there are failed negotiations, some remedy might be appropriate. We do not concede that a court inventing a global RAND license from scratch and imposing a term is an appropriate remedy. What might be is specific performance, specific performance to compel the parties to go back to negotiation. And potentially if there were a course of conduct in which the parties did have negotiation and if that course of conduct involved foreign patents, then the court would have some basis other than his own imagination to try to set a RAND rate. But absent that course of conduct, absent that breakdown of negotiations, this is premature. He's purporting to have a trial on whether you can set a RAND license before there's been an adjudication of breach. All that Montebello did is send, as is conventional in essential patent license negotiations, an opening offer.  Instead of a lawsuit about breach, we've got an anti-suit injunction. And that's what you should vacate. And Judge Berzon, I think you don't need to reach the merits if you agree with me that there are two different issues here, contract issue in Washington, patent infringement issue in Germany. But I have a very hard time with that premise. If you disagree with us, then you do need to reach the merits because you need to decide whether the district court's extravagant assertion of authority to set a global RAND license, to impose a global RAND license before he's even sent the parties out to try negotiating, then you would have to decide whether he has authority to do that. And I do think you have appellate jurisdiction to decide that if you have to get to it. You only have to get to it if you disagree with us that these are two different causes of action. So, Your Honor, I want to save some time for rebuttal. One practical question. The trial is set for November 12th. I gather that if we decided to vacate the injunction, the trial would still go forward. And if we decided not to, it would still go forward. Is that right? Well, Your Honor, we thank the Court for expediting this review and for expediting oral argument. We would respectfully request that you dissolve the injunction forthwith. It's a clear abuse of discretion and with an opinion to follow. Remember that one of our German patents is expiring in roughly six weeks. October 6th. In October. I'm not sure if that's the exact date. October 6th. Well, then, Your Honor, vacate her forthwith. It would be desirable. It's clearly forthwith. I think the question is the trial is going to go forward regardless. We think that it's up to you. If you were to agree with us that these are two different issues, then the trial would go forward. If you think that there is some kind of interference by the German action with the district court's authority, then we would respectfully request that you reach the question of whether he has authority to set a global RAND rate. And if you opine that he has not and do so before November, then it would forestall the trial. But remember that a lot of times these cases do settle. And the way that RAND licenses are normally worked out and the way that Motorola tried to work it out here was through negotiation. So there's no guarantee that the trial has to go forward. But if you dissolve the injunction, it will enable us to proceed with the ordinary process of enforcing our patents in a foreign jurisdiction, under foreign law, and negotiating RAND terms. The extravagant position Microsoft is taking, and you'll hear it in a moment, I'm sure, from my friend, is that by going to court in Washington, Microsoft can shut down patent litigation in every forum throughout the world, regardless of the territorial nature of patents. And that is an untenable proposition, and that's why you should dissolve this injunction. Thank you very much. Thank you, counsel. And we'll give you five minutes for a poll. If you want to equalize it, so why don't you put 30 minutes on the clock here. Yeah. So before we start, Mr. Phelps, I understand you threw out the first ball the other day. I did throw out the first ball. I didn't say it. Did you bounce it? No, I did not bounce it. I hit the glove. Just for the record, I wouldn't say that it was exactly a fastball, but I was using my change-up. I'll try to use my change-up this morning as well. I think I want to start with Judge Berzon's question because I think it gets to the heart of the case, which is, what is the nature of the relationship between the German action and the United States action? And ultimately, this all turns on contract issues. What is it that Motorola has agreed to? It has agreed to enter into a RAND rate. It has agreed to license its products on a global basis. It didn't agree to do it everywhere except in Germany. Now, Germany won't enforce the agreement as written, not because of patent law, but because of its own unusual standards for third-party beneficiary rules. It doesn't acknowledge third-party beneficiaries because it says you can't enter into an agreement with unknown and unknowable parties at that time. That's an unusual rule of law. My guess is it's not followed by many, if any, other countries. I have a backup question on that. As I understand it, Microsoft and Motorola are both parties to the standard-setting procedures, right? Why is Microsoft third-party? Why aren't they first-party? Well, the actual agreement is that some of it is between the standards. Why is Motorola third-party, I guess, is what I'm trying to understand. Well, Motorola would be one of the bilateral agreements, would be between Motorola and the standard-setting organization because they say, we commit on your behalf, we commit to you if you use our patents. But Microsoft, for other purposes and with regards to different patents, has made the same commitment to the same standard-setting organizations, right? Yeah, absolutely, Judge Berzon. I mean, I can't tell you why Germany is willing to sort of adopt this peculiar notion of third-party beneficiary rule for contract law as a mechanism for not enforcing what everybody recognizes is the appropriate way to go in order to ensure the entirety of the benefits that these standard-setting organizations can provide. It does have a way of dealing with the licensing issues here, but it does have a way of dealing with it. It does have a way of dealing with it, but it's one that ignores RAND, obviously. It's not seeking a reasonable and non-discriminatory. Well, it says it is. It says it is. Well, what it says is that the objective is to impose a rate that is not blatantly anti-competitive. I don't know what that means. It says unreasonable. Well, it actually says it has to be blatantly or obviously anti-competitive. This, of course, can look at it as unreasonable, I suspect. The contract that you're trying to move forward on, I'm a little concerned about that. Is this some document, this SSO, that everybody knows about? Yes. Well, yes, everybody knows about it. I mean, everybody who participates in it certainly knows about it. So you start negotiating something like the Orange Book, and that hasn't been done, but maybe doesn't need to be done. But if it is going to be contentious sooner or later, a price has to be determined. You didn't like the $4 billion, obviously you have something else in mind. And if you don't come together, then ultimately a price has to be determined. And that price is the Rand price. And this was brought to the attention of the district judge, and he thought, well, there will be six tried or true from the Northwest that will make that decision. Is this a factual determination or a legal determination as to the amount of the Rand price? I think it's a factual determination, Judge Wallace. The basic question is going to be, you know, how does this compare to similar actions taken with other licenses, and is it a reasonable one under the circumstances? The trial in November, just to be clear, is not going to be tried in front of a jury. The trial that's scheduled in November is a bench trial, and the judge, you know, expects to come up with what he regards as a reasonable and non-discriminatory verdict. Oh, he's not going to turn to the six tried and true that I read about. He's going to do it himself. So someone is going to have to take a look at these patents and determine their value. All patents are not the same. They're not of the same value. And determination come up with the so-called Rand rate. Right, I think that's exactly right. I mean, again, it's reasonable and non-discriminatory. But there's no question that in the same way that you would make a determination in an ordinary patent damages case, and you look at the value of the patent to the product, you don't get the value of the product. Well, it's very different. I mean, it is an extraordinary thing to have a court do, because this is a contract without a price in it. And when you're determining damages in a contract action, you're starting from something. And here you're starting from nothing. Well, to some extent that's true, although there are a host of licensing agreements that are out there against which you can compare under these circumstances. And you can certainly get experts who will testify as to the importance of connectivity, which is one of the patents to the overall value of the product, and come up with a reasonable royalty rate under those circumstances. I don't know that it's vastly different in this context than any other patent damages. How many patents is there liable to be involved? As I understand it, there are only the two involved in the injunction preceding there are two. I mean, Motorola has 50 patents that are involved generally. And, of course, the toll organization, I think there are several thousand. But this trial will be about 50 patents. I believe that's right, yes. Why would we consider this not a patent issue? Because, frankly, I would not be unhappy if you ended up sending it to the Federal Circuit, because it's only two blocks away from where I work. But I think the right answer is that this Court does have jurisdiction over this, because it doesn't arise under the Patent Act. There's no compulsory counterclaim that provides for a patent, and the decision is based strictly on the question of how to interpret the contract. That's kind of one way. The other way the patent question comes in is that the case in Germany was set up as a patent case. And the contract question did come up, but was quickly disposed of for the reason that you stated, i.e., that it's not enforceable in Germany. And then there was also some litigation or discussion of the Orange Brook procedure, which you might look at as the parallel to it. So the question of why isn't this a patent case has two meanings here. One is jurisdictional, but the other one is for purposes of the anti-suit injunction, there is lots of law saying that we don't enjoin foreign patent litigation. Right, but that's because if you are litigating U.S. patent rights and litigating foreign patent rights, those are completely parallel. They don't intersect at all. And that's some degree going on here because there also is a United States patent suit consolidated here. But the place where this entirety changes from parallel proceedings is at the point that you identified at the outset, which is the agreement that Motorola entered into, which was to provide a license across the board globally. So to me, the hardest problem here is what do we have to decide in order to decide the propriety of this injunction? You have made certain claims about what this contract is about and what the district judge can do. And it seems to me that the anti-suit injunction has to assume those. It has to assume that the district judge can set the RAND rate and that he can essentially grant a license and that inherent in this commitment is not having injunctions against the patent because there's going to be a license. Now suppose all that turns out to be wrong. You litigate it all. We leave the injunction in place. You litigate it all. You come up here. You win, let's say. A, you could lose. B, you could win. And we could come up here and appeal and we could say that was all wrong. He shouldn't have done any of that. So how much do we have to decide now in order to decide on the propriety of the anti-suit injunction? Well, I mean, as Ms. Sullivan said, this Court has consistently said it doesn't really want to look at the Well, it has, but I'm just questioning whether in this context that makes any sense because if we don't look at the merits, I mean, she's also saying therefore we go to the actual merits rather than to a prediction of the merits. Those are the two options. There are three options. We do nothing with the merits. We do a preliminary injunction-like prediction about the merits or we decide the merits. What should we do? I think that our personal preference and the way to approach this is the same way that Judge Robart did it, which is to say is there as a functional matter, and he took that straight out of this Court's decision implied medical, is there as a functional matter, a realistic prospect that what I decide in this case will, in fact, bring all of the litigation to a close? I think that's the test. The test is that. Well, the test in Gallo was sufficient likelihood of success. Right. And then implied medical was capable of disposing of the issues. And I suppose that's the test that we have to look at. If we let the Court go ahead with its game plan where there has been a demand and no response, and then if nothing else happens that he's going to be capable of going ahead and getting a decision of how much you're going to have to pay to get your license, and you'll have to pay it. We'll have to pay it, and we're committed to that. And in addition to that, we have to determine whether or not this is an interference with the comedy issue of the German courts. It has to be intolerable. That's the standard this Court's adopted. In Gallo, that well-written opinion. Excellent opinion, Your Honor. Let me just remind the Court, though, the position that Motorola took in the district court, we filed a 20-A-J letter on this, but if there is a breach in this case, the district court can enjoin Motorola from enforcing its standard essential patents against Microsoft unless and until Motorola makes an offer that is consistent with RAND. And that's all we're asking for, is they have to make us an offer that is consistent with RAND. We have categorically accepted that we will accept that offer. And we're done with this litigation at that point. But nobody knows what that is. And, therefore, there is some attraction in the notion that this should at least be an attempt at a bilateral determination initially. It's kind of like the National Labor Relations Board. It may be just a duty to negotiate in good faith. And if we were to read it that way, that hasn't happened here. To be sure, Judge Berzon, but at this point, we don't know how this litigation is going to play out. I think it is wholly premature for the court to try to figure out ultimately what will be the remedy after the judge makes a decision. I think you have a trial in November. The judge says the rate is hopefully the MPEG rate that everybody else uses, which comes to something substantially below the $4 billion number. It's a $6 million number for the entire group of people who participate in that pool. That number will be on the table. And then it will be up to the judge, if he chooses at that point, to say, look, I want to mediate this. I want you to sit down and negotiate in good faith. That will certainly be within his power to do that. Or he may say, I'm so comfortable with this rate that I think it's so clearly the correct rate, that you essentially tell them they have to take it or leave it. And if they refuse to grant a license on that basis, as they say categorically, if we don't do that, then an injunction should issue against us. And all we're doing is taking advantage on a preliminary basis. The same argument they say we would get on a permanent basis. There's, of course, a litigation issue there. And you may feel $4 billion is a little high. Maybe it is. My salary, everything looks high. But there's been no response from Microsoft. There's been a lawsuit filed. Doesn't that indicate that Microsoft is taking a bad faith position by not entering immediately into negotiations, if, in fact, Microsoft has entered into this agreement that there will be negotiations? I think that goes along with what Judge Merzon said. The judge and the administrative law judge in the International Trade Commission categorically described this specific offer as a sham. That this was just designed to check a box before Motorola goes off and does precisely what the entirety of this arrangement has designed as a halt, which is to go through conjunctive relief to enforce its patents. So you're excused because Microsoft takes the position that $4 billion is a sham. So you're excused from entering into negotiations and is better off to file a lawsuit. Yes, Your Honor. We are excused under those circumstances. It is our argument that that action on their part breaches their responsibility to come forward with more than they did. When you say it has to be a RAND offer, I mean, this is sort of what the German system was trying to get at. I mean, there are outrageous offers and there are bullpark offers that still might not be RAND. Right. Almost certainly won't be. I'm sorry? I said almost certainly won't be. But your position, as I understand it, doesn't depend on it being an outrageous or a sham offer. It's that they have to make a RAND offer or we get to go to court and have the court decide it. I think that's right. Well, I mean, I don't know where you want to draw the line, whether it has to be a RAND offer or not. What we have in this case is an offer that is so far out of bounds. Let me go back to my earlier question because it still seems it's relevant to this, too. I mean, if we're going to decide anything, we need to know what we're deciding. And I do not read Gallo or its predecessor case as saying that we look at the likelihood of success on the merits of the lawsuit as opposed to the likelihood of success on the merits of the injunction. What Gallo says is that the relevant likelihood of success is the likelihood of getting a permanent injunction, which doesn't include a likelihood of success on the merits, I guess. I don't understand it. I mean, to me, I'm still at the point that this is the key issue to me. How much do we have to decide on the merits of the case? Yeah, well, and I would propose to you, you have to be convinced that there is a reasonable basis for the position that we are taking. Obviously, if you think there is no chance of success on our contract theory, I would say that there's not much point in allowing the injunction to go forward. But if there is a reasonable likelihood of success, and then you turn to the other factors that exist under these circumstances, where the balance of the harms are clearly in our favor and the public interest is decidedly in our favor, then the injunction ought to be upheld on that basis alone. And you think that's what Gallo says? No, I read Gallo as suggesting that you're not supposed to look at likelihood of success, that you're supposed to look at these factors. But, again, Gallo's modified by Applied Medical, which says that it's not got to be the same issue, and it doesn't even have to be the same parties. It has to be an assessment on a functional level, which I think makes sense. It's a practical analysis. And can we resolve everything at one time, and can we do it without seriously infringing on the comedy in an intolerable way the interests of the German courts under these circumstances? And that's why, again, Judge Berzon, you focused on the narrowness of the injunction. It's not an anti-suit injunction. It's not an anti-injunction injunction. It's actually an anti-posting bond injunction, is all that the district judge did under these circumstances. And by doing it that way, he has allowed the litigation to go forward. And all of the concerns identified by my colleague about the patent law and the ability and the importance of enforcing their patent rights are completely uninterfered with under these circumstances. So your point is that you think that it's been demonstrated that it's capable of the court. It's capable of the court. The court is capable of disposing of this issue. Yes, Your Honor. And you don't think it has to go any further. That's applied medical and gallows as long as you get a reasonable chance. I think that coupled with all of the other factors, if all of the other factors tilt in favor of the injunction and the district court has, in fact, decided the right way to approach it is to grant an injunction, then I think what this court should do is respect that and regard that as not an abuse of discretion. So what we would have to do is say that the negotiations are liable to take place, even though there was an offer and a complete rejection by way of a filing of a lawsuit, and that if the parties never get together, which looks like what we have on the record so far, it's a long way from getting started on mediation, that the law will allow the district court to determine the RAND right, the RAND amount, and enforce it. That's exactly right. And just, you know, to be clear about this, that's exactly what the other side is saying Germany ought to be allowed to do. They use a different standard, to be sure, but they're going to pick a rate. They go through the orange book and they have to do the mediation, and if they don't do it, there's three judges that wear interesting-looking robes that make the decision. But this book is done judicially, and it's done on the basis, and it's sort of a curious negotiation. You pick a number, or you concede to the other side that they get to pick the number, and then you get to challenge it as being obviously anti-competitive, which is a standard I don't think any of us can intuit. So it's a different system, to be sure, but it's basically saying at the end of the day the judiciary will, in fact, resolve the question of what is the appropriate rate under which a license will be issued in this case. And it seems to me whether Robart does it or whether the Mannheim court does it is irrelevant to this purpose, at least certainly not an affront to comedy to allow Judge Robart to make the decision that we're asking him to make, and he's certainly empowered to make that decision. It's tolerable comedy. Tolerable. Very tolerable. Does your position depend on that being his ultimate conclusion, as opposed to – Well, I guess first question, has he already decided that, that that's what he's doing, rather than sending you back to negotiate for a while and then seeing whether he needs to do it? Has he decided that? As I understand what he's decided is that he's going to make a determination of a RAND rate, and then we'll see where things go from there. It seems to me it's quite possible that once you have a decision from the judge saying this is the rate I think makes sense, that the parties will negotiate at that point. So what he's going to decide is not whether the original decision was a RAND rate, original offer was a RAND rate, but what a RAND rate is. Right. That's in the first instance. There's still a question out there, obviously, of whether or not what Microsoft or what Motorola has done in all of this, you know, is a separate violation of the contract as well, and that's an issue that's going to have to get litigated down the road. But with respect to the injunction, it seems to me the central important element of this is he held the injunction in place until he could make that specific determination. All right. Well, suppose we thought, either now or eventually on appeal, that the obligation is more like what I described before, i.e., an obligation to negotiate, and that the court only gets involved if there's a breakdown. Does that affect whether the antitrust injunction is appropriate now or not? Well, no, because it's always going to be the case in any kind of an injunction where you make a prediction about the likelihood of success, in a sense, and you could be wrong, and under those circumstances perhaps injunctive relief shouldn't have been ordered in a particular case. I'm wondering something else, which is whether if that were the regime, would you still be entitled to an anti-suit injunction, because it still wouldn't be the regime that was ‑‑ it still wouldn't necessarily allow an injunction based on the patent to go forward. Right. I mean, the relationship between that and the need for an injunction to enforce the licensing obligation itself is sort of less apparent, I suppose, than in our situation, where the need for the license is dependent, obviously, on what we view as the RAND rate. So, you know, if what you're saying is, you know, there is no RAND rate implied in here, which I think is inconsistent with the way this contract reads. No, no, no. It's a question of how you get to it. And this, I think, is what Judge Wallace has been asking, too. Do you get to the RAND rate by running into court at day one, or do you get to it only when there have been negotiations that have broken down? That would still leave the judge available to decide the RAND rate, and it might still lead to the conclusion that that's what's supposed to operate, not an injunction against the patent. Judge Rosano, remember, and I go back to Judge Posner's analysis of this, which is that the whole purpose of the licensing obligation under these circumstances is that you forego seeking injunctive relief. And so by going to Germany to seek injunctive relief or any other court to seek injunctive relief breaches the agreement and therefore should give rise to an ability on our part to say, no, that's not appropriate. Whether our not negotiating somehow obviates their outrageous initial offer, I suppose an issue that can be litigated down the road, but I don't think that issue in any way undermines the need for us to be allowed to enforce their obligation not to seek injunctive relief under these circumstances. The obligation not to seek injunctive relief is independent of how you actually get to the RAND rate. Yes. Whether you get to it by negotiations in the first instance or whether you go right to court. Right. Ultimately, that's the obligation that we're trying to enforce, Judge Rosano, Your Honors. Let me ask another question. If I could, I'd ask the other side. I wanted to get your view of it. Do you see the setting of the RAND rate as an issue of fact or law? I think it's an issue of fact. Now, as I understand it, the district judge, if he had that thought in his mind before, has changed his mind as to whether or not he's going to make it a jury question. Has either side asked for a jury? No. As I understand it, I think both sides agreed to allow it to be tried to the bench rather than to the jury. Has that been made a part of the record? I'm confident it is because I've been told that it's a bench trial, and I've got to believe that that's been entered in someplace, but I don't know that immediately off the top of my head. But if you'd like, we can certainly supplement with a letter. I'm just trying to figure out how this thing is going to carry out in determining our understanding of whether there's a sufficient likelihood of success that you can get to the ends you want to get to. That's what I'm trying to look at, and it's kind of dark and murky down there as to what's happened because I don't think I've seen one before, and maybe there never has been one, in which these were set by a district judge in the United States. Do you know of any similar case we've had? Well, I mean, obviously there's other litigation arising out of Motorola's treatment, and there's the Apple case that's going on under these circumstances as well. But I don't – I mean, I think it is – the reason why you don't see more of these cases, I do think the parties – well, actually, there are two reasons. One is a lot of people put in essential patents, but standards essential patents, but don't enforce them. That happens a lot. And most who do enforce them make reasonable offers, and they get settled without any serious problem. Only Motorola, so far as I know, has come in and decided as a strategy and put it in context here. We're not talking about competitors. We're talking about essentially what in the vernacular would be called a troll. They haven't been known a patent. It happens to be a standard essential patent. They are in the least best position to be out there trying to create problems and probably the least best out there to be able to get an injunction under these circumstances where clearly – and I think this is where I would be inclined to end unless there are further questions – where clearly all they want is money. That's all that matters to them. And money we can take care of. But it shouldn't be extorted out of us through the power of injunctive relief. And if the district court comes along with $5 billion, that goes your argument? Well, at least I'm not being extorted out of the money by a private party. I may, if he comes up with $5 billion, be back here asking you to take a hard look at whether that's a reasonable, non-discriminatory term. So why isn't money an appropriate remedy in Germany at the end of the day? If we dissolve the injunction, that's what you'd be left with, right? Well, yes, but you still have all of the problems that Judge Robart identified, which is that this interferes with his ability to decide these issues under these circumstances. And why undertake that? I guess the part that I have the hardest time understanding is that the public interest clearly is better served by having the standards organizations be allowed to operate as they always have. The balance of the harms, they clearly, you know, they want money. They'll get money at the end of this process. There's no reason for any of the other standards to even remotely favor taking the, allowing the extraordinary action they've taken. How does the injunction, or the enforcement of the injunction, interfere with Judge Robart? I mean, the public interest is always fine. Go ahead and enforce that injunction. This action goes forward, and he decides whatever he decides. And, again, it's all money. So if it turns out that you've lost a bunch of money in Germany by, first of all, it appears that you're not, that the sales are going to be for three weeks or something from, if they even get their act together in time to enforce it, at least to one of the patents. Why, what is the problem? Why not just let them do it, and then we can all sort it out in the action in Washington? Yeah, well, I think the concern, the practical concern, obviously, is that if you, in fact, enter an injunction that orders Microsoft off the shelves for any period of time, the hydraulic impact of that kind of injunctive relief becomes so huge, given the size of that market, and the irreparable harm is so large that Microsoft has no choice but to enter into whatever RAND agreement Motorola essentially puts on the table at that stage because the price is too high. And the judge says, look, I'm not going to allow that to happen because that's not the system that's in place. The system that's in place is that you're supposed to negotiate on a RAND license based on the value of your patent, not on the basis of the value of the injunctive relief you can get in some other jurisdiction. So one of the patents is running out on October 6th, and the other one is how long? I don't actually remember off the top of my head. It's mid-2013 or something? Something like that, right? It's not that far off, but it'll be after the trial in this particular case. So it seems to me that the better way to think about it is leaving everything in place between now and the trial in November, and then we'll see how it all plays out at that point. Our hope is that this will all go away, and as much as I enjoy coming to San Francisco, I won't have reason to do that again. Do you think it's really going to be a trial? What is the damage of the patent which is going to die its quick death on October 6th? That is, if we affirm the staying of everything, there's obviously some problems that are going to take place playing time out. So what does your opposition lose if we grant your position? They don't lose anything. That's why the balance of the harms decidedly favor us, because all they want is money, and they'll eventually have the opportunity to get the money they want, whatever the royalty is that's determined, either by the German court or by the United States court, although I would submit that the right rand on a global basis ought to be decided by a U.S. court. I understand that, but specifically they indicated there's some patents that are going to die their sure death. What effect will that have on Rand's recovery, if any, on this system that's been set up by the district court? By the district court or by the Mannheim court? By the district court. Well, as I understand it, obviously you'll have a claim for infringement from the past, and therefore you'd have to pay royalties for any proven use of that particular patent. When the patent expires, you'll no longer have to do that. So it'll just affect the value of it as a reasonable term. That's a reasonable and non-discriminatory term. It doesn't have any value once it's expired. Yes, but up until that time, until it has expired, will this value go down as it gets closer to termination? That's the question I had. What harm are we doing to Motorola if we affirm the district judge, specifically in amounts of money? I don't think Motorola, one, has made that argument or made any suggestion like that. I don't know why it would make any difference in terms of how you evaluate what is a reasonable royalty under these circumstances. I don't know either. That's why I'm asking the question. I think the answer is it won't make any difference ultimately. It'll affect, obviously, the actual damages because you don't have to pay royalties on an expired patent, but I don't think it'll affect anything retrospectively. One last question. Your assumption about the effect of the standard-setting agreements or of the ranch commitment is that the commitment, I mean, does it depend on your understanding that the commitment to license is a license? In other words, it's undeniable that you didn't have a license for all the time you've been using this and that you didn't have a license in Germany. So where, and if a ranch rate is set, why does that mean that it applies to the period in time that you were operating without a license? Because that's, I mean, it's a reasonable compensation. If, in fact, we, you know, use their patents. But that's a patent case, then. In other words, that seems to expose the notion that what is being litigated in Washington is both a patent case and a contract case because the only way that you're going to get the ranch rate retroactively is essentially as the damages for interfering with the patent, for using the patent without a license. Well, I think, I mean, there's a separate issue, obviously, with whether the offer was so outrageous in the first instance that they breached the contract in a way that obviates our responsibilities under the agreement as well. I mean, that's an issue that ultimately will, I'm sure, be litigated as part of the contract action. Those are all contract actions. Because Judge Robart has consolidated the two actions, it's not really necessary for him just to separate it out. But it could well be pertinent to the propriety of the anti-suit injunction, which it is, because if it were a litigation of the patent violation itself, then clearly you don't get an anti-suit injunction. Right. If the, yes, that's true, because then you're talking about truly parallel proceedings that don't overlap. But the problem is that you have the core contract that operates here that takes, as I said earlier, that makes the parallel proceedings then become decidedly perpendicular at that point. If one assumes that the contract essentially gives you a license rather than the right to get a license. Right. But I think that, to be sure, and I think that the, that's the fundamental understanding. I mean, I go back to Judge Posner. I mean, it doesn't make any sense otherwise. What you want when you enter into these agreements, what you expect, and what everybody who then follows. Remember, these are thousands of innocent individuals. Nobody knows about these patents. What you know is these are standards. And if you follow these standards, you can use them everywhere in the world. And then somebody shows up after the fact and asks you for royalties for using your particular patent. That's all well and good. What they can't do is precisely what Motorola did here, is to essentially, on a pretense, make you an offer that you cannot accept and then go to court and seek the injunction. And indeed, they didn't even do that with the Germany. They just went off and sought the injunction in Germany. And that's why this is a perfect case for the court to halt that injunction. Not the rest of the litigation, just the injunction. I know your time is over, but there's one other question I want to ask, having to do with the Gallo situation of tolerable conflict, a comedy. In Gallo, the precise issue was it should have been tried in California. There was always a designation. So there wasn't any real conflict. It shouldn't have been down in South America anyway. It should have been in California. That isn't quite the situation here, as your adversary pointed out. Here there's Germany. There is a valid seat for action to take on it. Is that less tolerable because of that? And does it go over whatever that flexible line is of tolerability? No, because the problem is not the foreign selection clause, because it could just as easily have been true that Chile didn't accept foreign selection clauses, in the same way that Germany doesn't accept third-party beneficiary clauses. The question really is the importance of the contract, and do you enforce the parties' agreement to operate under these circumstances? It's not the particular clause, and even Ms. Sullivan said if it were an arbitration clause or some other clause, it wouldn't make any difference. They would be treated exactly the same. To my mind, the principle here is that it's the refusal to abide by your own agreement voluntarily and to have created the dispute in Washington by making your demand in Washington on a global basis. They didn't just say give us for the U.S. patents. They said give us this money for a license for all of the patents under these circumstances. All of that says that this is appropriate, both as a matter of what they generally contracted to when they entered into this with the organizations, and in their treatment of the litigation itself, that the right place to litigate this is strictly in the state of Washington, and it doesn't do any injury whatsoever to Germany, because it's just a contract issue. That's all. Thank you, counsel. Thank you, Your Honor. We'll put five minutes on the clock, and, of course, Ms. Sullivan, our questions may take you over that, but I want to give you five minutes straight out. Thank you, Judge Thomas. To begin, Judge Wallace, with your point about intolerable offense to comity, you're quite right that the forum selection clause in Gallo, by which the parties agreed to litigate disagreements in California, meant there was no offense to comity. If you told Ecuador, they couldn't proceed. Same thing with Belgium in applied medical. Here, however, we litigated in patent infringement of German patents in the only forum in the world in which we could litigate patent infringement of German patents, Germany. So this is a textbook paradigmatic case in which our action in Germany was not vexatious as a matter of law. We litigated in the only jurisdiction that has control over patent rights. Judge Wallace, in answer to your question, has there ever been a... If, in fact, you had a... Suppose you had a contract, as some of the commentators have said, the standards-setting organization agreement should say, and they don't say it specifically, that says you cannot sue for an injunction. And then you did so. Your position has to depend on that not existing. The meaning of the contract. Your Honor... Right. Again, ER 351 and 353 couldn't say more plainly in the principles of the ITU that a declaration of essentiality or a declaration to license unran terms is not an actual license. Couldn't be more clear that the declaration is not a license. So the fundamental... All I'm saying is that the comedy issue is so bound up with everything else that it doesn't seem to have any independent license. And, Your Honor, let me refute Mr. Phillips. He tried to denigrate the Orange Book procedure as much as the district court did. If you needed an illustration of sort of disregard for German substantive law, we saw it again when he reduced the German opinion to a mere disagreement about third-party beneficiaries. It is not. If I could refer you to ER 221 and ER 232, you will see the essence of the German court's decision in translation. And that is, Judge Berzon, the German court interprets a declaration of essentiality and a commitment to license unran terms as not waiving the right to injunctive relief, 221. It does not waive the right to injunctive relief that you said you would enter into license negotiations. And the reason, Judge Berzon, you've stated, on the merits, the only correct position here is that there could be that the district court, Judge Thomas, you said, what if the parties don't agree? Well, then the district court could order, as in an NLRB case, order them to go to the table and negotiate in good faith. That's a terrible situation. And, in fact, there are alternate regimes which end up with an interest arbitration where somebody does decide, because otherwise you could end up with a complete stalemate. Fair enough, Your Honor. But in this case, and it's not just that Microsoft countered our letter of October 29, 2010, with a lawsuit two weeks later. They didn't pay anything on our essential patents for years. They didn't come to us asking for a license. They didn't pay us anything for using our patents. And they didn't enter into any negotiations or offer to do so. So there's a long history here of their refusal to enter it. And, Judge Thomas and Judge Berzon, if there needs to be some judicial intervention here, it can come in the form of saying, well, there's now a course of conduct. We have something to look at in the parties' negotiations. Now we have some material from which the court might set a term. But it's terribly premature to decide that here where there's been no adjudication of breach. And I must object to Mr. Phillips trying to go outside the record and refer to an ITC finding as if to suggest that this was a sham offer or a demand. It was not an offer. It was neither. If you look at the actual letter of October 29, it's an opening offer. It simply asks for a prompt response. What do you think of this rate? We didn't get one. It's an opening offer. It's neither a demand and there's been no finding of sham. And to the contrary, the district court in this case rejected Microsoft's motion for summary judgment on breach, saying I have to determine whether Motorola made that offer in bad faith. That hasn't been determined yet. And the reference to the ITC finding is irrelevant here. Your Honor, Judge Berzon, you asked to be clear. If you reach the merits, you should hold that an ITU declaration of essentiality is not a license and does not create a binding contract for the judge to fill in a term. What the district court is entitled to do in this action if it continues is not to have the trial he wants to have in November, but instead to decide if there's been a breach. And if there's been a breach, the remedy should be specific performance. Because the ITU itself tells you on ER 351, it says over and over and over again, RAND rates and terms are to be determined by the parties. They are not to be determined by the SSO. And we think they're not supposed to be set by the judge. The reason why Germany has the Orange Book procedure, and this is clear in its opinion, is it doesn't think judges should be in the business of setting the rate. It wants to incentivize the parties to negotiate. And in answer to the practical question, what will happen if you vacate this anti-suit injunction, as you clearly should, if you vacate this anti-suit injunction and we go to enforce in Germany, you can't just assume that Xboxes and Windows and Explorer will be off the shelf and will be lost sales, although we could take care of that later through money, as Judge Berzon suggested. If you look at ER 340, the expert declaration of Marcus Grosch on what the Orange Book procedures allow, you'll see that even now, Microsoft in Germany can simply avail itself of Orange Book procedures. If we try to enforce the injunction, it is free even now to escrow money into a German court and to pay us a royalty and a German court can later decide if we've asked for too much and Microsoft can pay less. But what Microsoft has sought to do is, in a sense, innovate along the way. Remember, it never asks for a license or a royalty rate in its complaint. If you look at paragraph 9 of the complaint and the prayer for relief at the end of the complaint, there is no request for a license set by the court. There is no request for the court to invent a license at a full cost. Well, Mr. Phillips says now we've offered, kind of in the course of litigation, innovating as we went along. We said, well, now we'll take a license. But they want it set by a court in Seattle rather than a court in Mannheim. And that's illustrative of what the offense is here. Is it your understanding that the Orange Book rate that would be set through the available Orange Book procedure purports to be a RAND rate? At some point, people seem to be saying it's the same thing, and at other points they seem to be saying, no, it's kind of an off-the-wallness rate. It's a rate that says what would be an off-the-wall rate. Well, Your Honor, what the Orange Book procedure is designed to do is the same thing as the ITU principles are designed to do, incentivize the parties through bilateral negotiation to arrive at the RAND rate rather than have it set exogenously by any court. But the way that Orange Book does that is it throws out the offer if it's out of the ballpark, as you said. And there's really two sources of law in Germany. European antitrust law is part of where Orange Book comes from. Remember, it's a German high court decision but under the shadow of European antitrust law, in which the fear is that it will be an abuse of monopoly power for the essential patent holder to charge too high a rate once it's declared essentiality and committed to RAND terms. But it's also an aspect of German patent law. And the Mannheim decision says it's relying on German patent law to decide that a declaration of essentiality and a commitment to a RAND rate is not a waiver of the right to injunctive relief. And that's where the intolerable offense to comity comes in. And, Your Honor, I want to suggest that, remember, in Gallo, any one of those factors is good enough to defeat the injunction. And to tell a German court that its Orange Book procedure is not a good way, and if you look at ER-24 and ER-34 in particular, ER-34, the oral grant of temporary restraining order, Judge Robert says, well, I don't like that Orange Book procedure. I don't see how negotiating in the shadow of an injunction isn't coercive. Well, that may be his view under American law, but that's not German law. But that's why it seems to me that the comity issue is all tied up with the merits because if the injunction, if you had a contract that said in no uncertain terms that we agree that we're not going to seek an injunction, then the fact that the German court would give an injunction doesn't seem to be very relevant. You need to at least get to the point, as you've been at other points recognizing, of evaluating that claim that this is really an agreement not to seek an injunction. Your Honor, here's how I would put it simply. You need not reach the merits if you agree, as you said before, that enforcing the injunction in Germany doesn't do anything to take away Judge Robert's powers. Judge Robert can go on with his trial in any order he wants. He can issue relief that we will seek to overturn an appeal because it's wrong on the merits. But nothing in the German enforcement displaces the action in Seattle. It's a contract action. He can take the German action, the German rate, if anyone has said, if there's ultimately a settlement in Germany, he can take the German RAND rate into account in setting his global RAND rate. Remember, RAND rates can be different in different jurisdictions. Coming up with a global RAND rate means the complicated exercise of deciding what all the different pieces operate and how to average. And Judge Wallace, you asked before, has there ever been a judge who ever purported to set a global RAND rate? And the answer to your question is no. Well, wasn't that the issue in the case before Judge Posner, and he didn't do it because he said that the submissions were inadequate, but not because he thought it was conceptually impossible? Your Honor, if anyone could set a global RAND rate and get it right, it would be Judge Posner. But even he didn't purport to set that rate. Not because he thought it was conceptually impossible or inappropriate, because he thought that the material he was given was inadequate. On the damages. But actually, what he said in that case was that if – all he said is that injunctive relief should be impermissible as to a U.S. patent. He was following eBay reasoning. Germany doesn't follow that. And why you should – But as to the question of what he would have done had he thought the record adequate, he was looking to set a RAND rate, wasn't he? Your Honor, he was looking at damages. What he threw out were damages testimony retrospective. And that actually gets me to an important point you made earlier, which is, if you think about this case, and Judge Wallace said, what's the harm here? There's only one patent that's going to run out. Well, the other patent is not going to run out until next year. So we're suffering ongoing, continuing infringement until next year, which the German injunction should be enforceable to prevent. But, Judge Berzon, you said, well, if we turn this into a retroactive license case, then it becomes like a parallel patent litigation. And I believe Mr. Phillips conceded yes, that's so. Once that's true, then the anti-suit injunction cannot stand. Because if Judge Robart is essentially just deciding what our retrospective royalty should have been under a proper RAND license for all the past infringement we're suffering, then he's, in a sense, deciding a patent infringement question under U.S. law. We shouldn't be enjoined from enforcing Germany's approach. So to summarize, you should void the injunction because there's an intolerable offense to come to me that's sufficient. There's a lack of U.S. policy here because there's no forum selection clause. And none of your precedents has ever suggested there's a U.S. policy here. Mr. Phillips has no basis to say a U.S. court has more business than other bodies in deciding a RAND rate. This is set by the ITU, which is a U.N. body, an international body. There's no special U.S. province of law here about international globalized standards. So you should throw it out for any – you should throw out this injunction for either intolerable offense to come or the lack of a U.S. policy. And then if you focus on the first factor, we think that there's no harm from enforcement of the German injunction to Judge Robart's jurisdiction as he conceives it. So there is no displacement. There's no way in which the German injunction interferes with or prevents him from disposing of the case. But if you disagree with us on that, then you have to reach the merits. And you have to roll him back from this extravagant assertion of authority to set a global RAND rate, which nobody's ever done, at least in the absence of a finding of breach through failure to engage in good-faith negotiations or failure to accept a RAND offer, none of which has ever been offered. So we respectfully request that you void immediately and forthwith, through summary order, this injunction with an opinion to follow. And should you reach the merits, we respectfully request that you state that, absent a breach, the assertion of extravagant authority to set the first-ever global RAND rate is premature and unmarked. Thank you, Counselor. The case is here to be submitted for decision. And Ms. Sullivan felt well-argued. And I also want to thank both of you. You have both contributed generously to the Ninth Circuit Conference by attending and participating, and I want to give you my personal appreciation for that. We'll be in recess.
judges: Wallace, Thomas, Berzon